**SOUTH SUBURBAN HOUSING CENTER, an Illinois not-for-profit corporation; Peter Dykstra; Thomas Gray; Stanley Clauson; Edward Brown; Joseph Agne; James Hill; Dorothy Bass and Loren Robertson, Plaintiffs,**

v.

**SANTEFORT REAL ESTATE, INCORPORATED, an Illinois Corp.; Cowing Realty Limited, an Illinois corp. and Santefort Cowing Realtors, a partnership, Defendants.**

No. 82 C 7518.

United States District Court, N.D. Illinois, E.D.

April 28, 1987.

Thomas H. Morsch, James R. Stinson, Linzey D. Jones, Sidley & Austin, Chicago, Ill., for plaintiffs.

Don H. Reuben, Rene A. Torrado, Jr., Reuben & Proctor, Bruce J. Van Heukelem, Chicago, Ill., for defendants.

1. Both parties agree that the standing analysis is identical under 42 U.S.C. § 1982 and the Fair Housing Act. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975);

## ORDER

NORGLE, District Judge.

This is an action for declaratory relief and money damages brought by the South Suburban Housing Center ("Center") and other named individuals. Defendants are two suburban real estate corporations and a partnership. Plaintiffs allege that defendants have engaged in illegal discrimination by practicing "racial steering." Such practices are alleged to violate the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, Title VIII of the Civil Rights Act of 1968, and the Civil Rights Act of 1866, 42 U.S.C. § 1982.[1] This case comes before the court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 challenging plaintiffs' standing to bring this action.

Rule 56 provides for the entry of summary judgment if the record on the motion reveals "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). An opponent of a properly supported Rule 56 motion must set forth specific facts showing that a genuine issue does in fact exist for trial. *Anderson v. Liberty Lobby,* — U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opponent of the motion receives the benefit of all reasonable doubts and inferences arising from the underlying facts. *See generally,* 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil 2d* § 2727. Only reasonable inferences favoring the opponent of the motion, however, will be considered by the court. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). In other words, the court need not displace logic or disregard inferences which unavoidably follow from the established facts. With this understanding, the

*HOPE, Inc. v. County of DuPage, Illinois,* 738 F.2d 797, 799, 804 (7th Cir.1984) (en banc). Thus, the court's consideration of plaintiffs' standing applies to both claims.

court now turns to the facts established in the present case.

## I.

Plaintiffs in this action are the Center, an Illinois not-for-profit corporation, and eight individual plaintiffs, Peter Dykstra (a white resident of Lansing), Thomas Gray (a white resident of Park Forest South), Stanley Clauson (a white resident of South Holland), Edward Brown (a white resident of Calumet City), Joseph Agne (a white resident of Harvey), James Hill (a black resident of Park Forest South), Dorothy Bass (a black resident of Calumet City) and Loren Robertson (a black resident of Harvey).

One of plaintiff Center's corporate purposes is to eliminate discriminatory housing practices in the southern suburbs of Cook County, and to develop and maintain racially integrated communities through the "testing" of real estate offices in the area for violations of fair housing laws. In addition, Center receives, investigates, and refers complaints regarding discriminatory housing practices to various agencies and private entities, and provides counseling and other referral services to help homeseekers of all races locate housing in stable, racially integrated communities. Center uses "testers" to search out discriminatory practices. Testers pose as prospective renters or purchasers of real estate and use real or fictitious names when calling on landlords or sellers. Testers return to the Center and report the test results to supervisors.

The eight individual plaintiffs named above are residents of five different communities in the southern suburbs which have allegedly been affected by the conduct of defendants. The individual plaintiffs are not testers associated with Center who were turned away from housing. Nor were they seeking to purchase homes in the target area.

Defendants are Santefort-Cowing Realtors, a partnership, which includes as general partners, defendants Santefort Real Estate and Cowing Realty. The partnership has sales offices in Dolton, South Holland, Lansing, and Calumet City. All of these communities are within the target area. Defendant Santefort-Cowing's business includes acting as a real estate broker or agent for residential property located in the southern suburbs. Santefort-Cowing is one of the major real estate brokerage firms in the southern suburbs of Cook County accounting for 33% of all residential property sales and 36% of all properties listed in the multiple listing service. (See Pltf's. Stmt. of Gen. Issues, ¶ 10, at 5).

The target area identified in the complaint is an area of south suburban Cook County which encompasses approximately 220 square miles and which has a population in excess of 400,000. Defendants' residential real estate market and Center's service area include more than 30 municipalities in two counties with a total 1980 population estimated by Center at 700,000. The geographic area within which Center conducts its testing is bounded by Harlem Avenue on the west, 127th Street on the north, the Indiana border on the east, and a line approximately three miles south of Steger Road on the south. The individual plaintiffs are residents of this geographic area, residing as far south and west as Park Forest South and as far north and west as Calumet City. The City of Chicago, population 3,000,000, is north of the region which is the subject of this complaint.

During 1981 and 1982, Center conducted 26 tests of defendants' four real estate offices located in Calumet City, Dolton, Lansing, and South Holland. These four offices were chosen because they were located in four contiguous communities that according to the 1980 Census were segregated white communities. According to plaintiffs, Dolton's population was 95.9% white, South Holland's 99.5%, Calumet City's 94.1%, and Lansing's 98.9%.

The tests were performed by "matched" black and white testers in an attempt to determine whether defendants were engaging in racial steering, i.e., attempting to influence prospective home buyers to purchase properties in different areas according to their race. According to the complaint, the results of Center's tests showed defendants attempted to influence black prospective home buyers from purchasing

homes in Lansing, Lynwood, South Holland or areas of Calumet City and defendants attempted to influence white prospective buyers away from areas having a significant number of black residents.

Plaintiffs attribute defendants' continuing pattern of racial steering to specific racial comments made by defendants' sales agents to the testers. These comments allegedly were designed to discourage them from interest in certain communities or areas. Examples of comments made include the following:

a) "Harvey has bad areas, can't say why they're bad because [I am] not allowed to say anything racial."

b) "[Y]ou don't want The Park [its] segregated ... not a good place to raise kids" and "[y]ou wouldn't want to even consider this, its [The Park] about 60 percent black now."

c) "South Holland doesn't have the type of home you're most interested in [bungalow];" and "Lansing has few assumable mortgages and conventional mortgages are difficult to get there."

Further, plaintiffs allege that defendants attempted to influence prospective home buyers through housing choice recommendations and differential treatment.

In addition, Center alleges that as a result of defendants' discriminatory practices, its efforts to help homeseekers find housing in racially integrated communities have been frustrated. Center also claims it lost resources which were expended to identify and counteract defendants' alleged racially discriminatory housing practices. The individual plaintiffs claim injury in that the actions of defendants deprived or threatened to deprive them of their asserted right to enjoy the professional, economic, aesthetic, political, and cultural benefits of living in a stable, racially-integrated community.

Defendants have filed a motion for summary judgment challenging plaintiffs' standing to bring this action and consequently this court's subject matter jurisdiction. Defendants argue that no "tester" identified in plaintiffs' complaint is a party to this action. No individual who was a member of or was served by Center is a named plaintiff or is in any way involved with the tests conducted by Center. The individual resident plaintiffs do not allege that they had any contact with any defendant or salesperson of the defendants. In fact, defendants were selected for testing on a random basis without any specific complaint by the individual plaintiffs that defendants were engaging in racial steering.

Defendants further argue Center's testing program was not conducted in response to the concerns of the individual plaintiffs and would have been conducted even if the defendants did not exist. Center does not allege that any homeseeker it was assisting was discriminated against by defendants; nor do the individual plaintiffs claim defendants' conduct caused any loss in property values or harmed the tax base in any communities within the target area. Finally, defendants argue numerous other factors indigenous to the 220 square mile region explain the housing pattern in south suburban communities and that any injury suffered by plaintiffs is unrelated to defendants' alleged conduct. These plaintiffs, therefore, cannot show they have suffered injury in fact related to defendants' conduct. Defendants argue their motion for summary judgment should be granted because plaintiffs have no standing.

## II.

Many recent Supreme Court cases have explored at length, arguably not always with consistent results, the requirements of plaintiffs to show standing in a federal court. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). At the core of the standing issue is Article III's requirement that a "case or controversy" be squarely presented before a federal court exercises jurisdiction. "In order to satisfy Article III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."

*Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

In addition to the core constitutional requirements, a plaintiff may still lack standing under prudential principles "by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976). The Court has concluded, however that these prudential limitations do not apply to claims brought under sections 810 and 812 of the Fair Housing Act of 1968, 42 U.S.C. §§ 3610, 3612. *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Gladstone, Realtors,* 441 U.S. at 109, 99 S.Ct. at 1612 (1979). Standing under sections 810 and 812, therefore, is as broad as is permitted under Article III of the Constitution.

The heart of the constitutional standing doctrine is the requirement that a plaintiff have a "personal stake in the outcome of the lawsuit" evidenced by the existence of "injury in fact:" a "distinct and palpable injury." *Duke Power,* 438 U.S. at 72, 98 S.Ct. at 2630; *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Moreover, this injury must be fairly traceable to defendants' allegedly illegal conduct. *Warth,* 422 U.S. at 504, 95 S.Ct. at 2208. Finally, the plaintiff must demonstrate the injury will be redressable if the court grants the relief requested. *Id.* With this general background in mind, the court turns to plaintiffs' standing under the Fair Housing Act.

### III.

The issue presented by defendants' motion is whether a plaintiff who has not been the victim of direct discrimination has standing under the Fair Housing Act to complain of regional discriminatory racial steering. More specifically, whether black and white residents who are not direct victims or "testers," have standing as residents of a 220 square mile area with a population of 700,000, to sue for damages and injunctive relief from racial steering by defendants which allegedly continues or causes racial non-integration within the region. Further, the court must determine whether the Center has standing in its individual capacity by virtue of an alleged impairment of its organizational function and purpose. Resolution of these issues is guided by the Supreme Court's decisions in *Gladstone, Realtors, Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

In *Trafficante* two tenants of an apartment complex, one white and one black, filed complaints with the Secretary of Housing and Urban Development alleging their landlord discriminated against non-whites. The tenants claimed they were injured because they had been deprived of the social benefits of living in an integrated community, they had lost business opportunities which would have accrued if they had lived with members of a minority group, and they had suffered embarrassment as a result of being "stigmatized" as residents of a white ghetto. *Id.* at 209, 93 S.Ct. at 366.

The court concluded these allegations were sufficient to confer standing under § 810(a). *Trafficante,* 409 U.S. at 208-10, 93 S.Ct. at 366-67. The court found that section 810(a)'s reference to "[a]ny person who claims to have been injured by a discriminatory housing practice" reflected a congressional intention to define standing as broadly as Article III permitted. *Id.* As the court noted:

> We can give vitality to § 810(a) only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within coverage of the statute.

*Id.* at 212, 93 S.Ct. at 368.

In *Gladstone, Realtors v. Village of Bellwood,* the Court considered whether six individuals and the Village of Bellwood had standing to sue under section 812 of the Fair Housing Act. The six individual

plaintiffs were testers who attempted to determine whether the defendant real estate companies were engaged in racial steering. Plaintiffs were also homeowners in the community against which the defendants' alleged steering was directed. The plaintiffs alleged the defendants followed a practice of steering black homeseekers to an integrated 12 x 13 block area of Bellwood and away from predominantly white areas of the Village. White homeseekers, however, were steered away from the integrated areas of Bellwood and encouraged to seek homes in the predominantly white areas.

The court held that, like section 810, section 812 of the Fair Housing Act had no special standing limitations to bringing suit for a violation of its provisions; the Article III standard that plaintiff show he "personally has suffered some actual threatened injury as a result of the putatively illegal conduct of the defendant," is all that is required under § 812. *Gladstone, Realtors*, 441 U.S. at 99, 99 S.Ct. at 1608. Turning to the injury allegedly suffered by plaintiffs, i.e., the denial of their right to live in an integrated society, the court construed the claim as referring only to the 12 x 13 block target area in which four of the six plaintiffs resided. *Gladstone, Realtors*, 441 U.S. at 113–114, 99 S.Ct. at 1614–15. The court, refusing to limit its earlier decision in *Trafficante*, held that there is "no categorical distinction between injury from racial steering suffered by occupants of a large apartment complex and that imposed upon residents of a relatively compact neighborhood such as Bellwood." *Gladstone, Realtors*, 441 U.S. at 114, 99 S.Ct. at 1615. The test is whether the plaintiffs have suffered a "distinct and palpable injury." *Id.* The court found that the plaintiffs who were "residents of the carefully described neighborhood in Bellwood" suffered economic and social harm sufficient to confer standing. The court permitted the two plaintiffs who lived outside the 12 x 13 block area to amend their complaints on remand if they could state allegations of actual harm.

In *Havens Realty Corp. v. Coleman*, the court addressed the issue it left unresolved in *Gladstone:* whether individuals who

serve as testers have standing under the Fair Housing Act. Three individual plaintiffs were employed by plaintiff, a fair housing organization (HOME), to make inquiries of defendant realty company regarding the availability of apartments. The court concluded these plaintiffs had standing as testers because the Fair Housing Act established a right to receive truthful information concerning the availability of housing. *Havens Realty*, 455 U.S. at 374–375, 102 S.Ct. at 1121–22.

In assessing whether the plaintiffs had standing as residents of the community, the court reaffirmed that persons who are subjected to discriminatory practices, whether direct or indirect had standing if they could show they suffered injury in fact. The plaintiffs were residents of the Richmond metropolitan area. The court questioned, however, whether discrimination in a particular neighborhood could generate the basis for standing in an entire metropolitan area.

It is indeed implausible to argue that petitioners' alleged acts of discrimination could have palpable effects throughout the *entire* Richmond metropolitan area. At the time relevant to this action the city of Richmond contained a population of nearly 220,000 persons, dispersed over 37 square miles. Henrico County occupied more than 232 square miles, in which roughly 170,000 people made their homes. Our cases have upheld standing based on the effect of discrimination only within a "relatively compact neighborhood," *Bellwood*, 441 U.S., at 441, 99 S.Ct., at 1615. We have not suggested that discrimination within a single housing complex might give rise to "distinct and palpable injury," *Warth v. Seldin*, 422 U.S., at 501, 95 S.Ct., at 2206, throughout a metropolitan area.

*Havens Realty Corp.*, 455 U.S. at 378, 102 S.Ct. at 1124. The court doubted plaintiffs had standing but remanded the case to the district court for further factual development. *Id.* at 379, 102 S.Ct. at 1124.

Finally, the court considered whether HOME had standing based on its allegations of frustration of its counseling ef-

forts. The court concluded that where the organization's ability to provide counseling and referral services is coupled with a consequent drain on its resources, the organization has suffered injury in fact. *Id.* at 380, 102 S.Ct. at 1125. Because HOME alleged frustration of its corporate purpose and interference with its ability to provide counseling for low-housing homeseekers, it had standing under the Fair Housing Act.

**IV.**

■ A review of these cases and the factual record developed on this motion convinces the court that plaintiffs have no standing to bring this action and, therefore, defendant's motion for summary judgment must be granted. The court concludes plaintiffs have not shown they have suffered injury in fact, that their minimal articulation of injury is directly traceable to defendant's alleged discriminatory conduct, or that this court could redress plaintiffs' alleged injury.

*A. Injury in Fact*

To satisfy Article III plaintiff must show he personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. *Duke Power Co.*, 438 U.S. at 72, 98 S.Ct. at 2630 (citing cases). A plaintiff must assert an injury that is peculiar to himself or to a distinct group of which he is a part rather than one "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Plaintiffs have failed to demonstrate such an injury.

Plaintiffs were not homeseekers who were denied housing. They were not steered away from any community by defendants. They were not testers who were given untruthful information about housing. Any claim to injury, therefore, rests solely on their residence in non-integrated communities.

The individual plaintiffs simply allege that defendants' racial steering has deprived them of the social, political and economic benefits of living in an interracial community. This type of harm can support standing. The court has found standing

based on this type of injury arising from racial steering practices when defendants' conduct occurs within a "relatively compact neighborhood" or an identified "target neighborhood" in which a plaintiff resides. *Gladstone, Realtors* (a 12 x 13 square block area affected); *Trafficante*, 409 U.S. at 208, 93 S.Ct. at 365 (one apartment complex affected); *Havens Realty Corp.*, 455 U.S. at 376–378, 102 S.Ct. at 1222–24 (entire Richmond, Virginia area held insufficient to establish standing). The court has never supported a claim based on residential standing in a region encompassing an area as great as 220 square miles, two counties, including 30 distinct municipalities, and a population of 700,000 in the service area or 400,000 in the target area. The court's emphasis on "compact" neighborhoods and "target areas" and "particular" communities supports the conclusion that standing may not be based on a regionwide basis. It is implausible that defendants' alleged acts of steering could have palpable effects throughout the entire four suburban areas of Lansing, Lynwood, South Holland, and Calumet City, let alone the 30 communities in the south surburban area encompassed by Center's service area.

The individual Plaintiffs have simply not established any discrete acts of discrimination occurring in a relatively compact area. Nor have plaintiffs established the proximity of their residences to the area where defendants' engaged in discriminatory conduct (as shown by where the testers visited); nor have they identified their particular neighborhoods other than by reference to various municipalities. Plaintiffs have not alleged their neighborhoods were losing their integrated character or experiencing rapid racial change. Plaintiffs fail to show *any* trends in the racial composition of any of these communities. In the absence of any allegations or proof of harm, such as these, the court cannot conclude that an entire region has been harmed by steering practices claimed by 21 testers directed at unspecific locations.

The type of injuries alleged here are not, as plaintiffs allege, similar to the type of injury found in *Bellwood.* In that case, plaintiffs alleged that the steering practic-

es of defendants transformed a small neighborhood in a single municipality from an integrated one into an almost entirely black environment and thus deprived plaintiffs of the benefits of living in an integrated society resulting in economic injury. These individual plaintiffs simply plead that they were residents of various communities in south suburban Cook County; they failed to demonstrate how the asserted steering practices of defendants have affected their particular neighborhood where they reside. They do not allege their property values have declined or that their city's tax base has been diminished. It is implausible that defendants' alleged acts of discrimination or steering could have effects throughout the entire south suburban metropolitan area. At the time relevant to this action, this area encompassed approximately 220 square miles. *Bellwood* simply does not support plaintiffs' allegation of injury.

The individual plaintiffs' articulation of their harm buttresses the court's conclusion. Plaintiff Dykstra states his injury stems from "the fact that we as a democracy have had to support a large number of segregated people" and a "general feeling of dissatisfaction and disappointment with our society that we have this condition," (Deft's. Exh. No. 1, p. 16) and "... we have not—certainly haven't followed the Golden Rule on the one hand." Plaintiff Clauson's injury stems from "... it seems to me that justice is not being done to people if they are not given the opportunity to purchase property that they can afford and have all the things that we supposedly guarantee in our society. And I think, ... if it hurts one of us then maybe that's trying to say it ends up hurting all of us." (Deft's. Exh. No. 2, p. 13).

The plaintiffs advance an extremely generalized (if well intentioned) claim of injury throughout a 220 square mile area. There are no factual allegations, however, that provide a connection between the defendants' alleged conduct and plaintiffs' alleged injury. "Abstract injury is not enough.... It must be alleged that the plaintiff has 'sustained or is immediately in danger of sustaining some direct injury.'" *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669,

675, 38 L.Ed.2d 674 (1974). In the absence of such proof, plaintiffs cannot establish that they lived in areas where defendants practices had an appreciable effect. Plaintiffs are attempting to expand the concept of neighborhood standing as seen in *Bellwood* and *Havens* into a concept of regional standing. It has not yet been suggested by the court that discrimination directed at selected areas, might give rise to a distinct and palpable injury to everyone in a 220 square mile region.

Thus, the court concludes the individual plaintiffs have not shown a sufficient harm to establish injury in fact. The allegations of harm are too generalized, arise from too broad an area to have been impacted by defendant's conduct, and are not distinct and palpable enough to confer standing on the individual plaintiff residents.

■ Center has likewise failed to show an injury in fact. As a public organization, it may not base standing to recover institutional funds expended in exposing the steering practice of the defendant real estate companies. *Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013, 1017 (7th Cir.1978) (portion of Seventh Circuit decision left undisturbed by Supreme Court's decision). Moreover, Center's Executive Director, Christine Klepper conceded in her deposition testimony that defendants never interfered with any of Center's services in any respect. Center made its own decision not to make referrals to defendants. In addition, Center had a 90% success rate in placing those persons it did serve through alternate real estate brokers. Thus, plaintiff Center has not shown that defendants have interfered with its counseling decisions or its ability to place residents in homes in the south suburban communities. It, therefore, has suffered no injury in fact.

### B. Plaintiffs' Injury Is Not Fairly Traceable To Defendants' Conduct

Even if the court assumed plaintiffs had sufficiently shown injury in fact, plaintiffs must also show that the injury complained of is fairly traceable to the defendants' conduct. In other words, plaintiffs must

show that absent defendants' conduct, there is a "substantial probability" they would enjoy the benefits of a racially integrated community. *See HOPE, Inc. v. County of DuPage*, 738 F.2d 797, 806 (7th Cir.1984) (en banc).

In *HOPE*, the plaintiffs sued the County of DuPage for its exclusionary zoning practices which plaintiffs alleged denied adequate housing to low and moderate income persons. The court found a total absence of causal connection between the county's conduct and plaintiffs' injury. The *HOPE* court relied on *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) in analyzing this issue.

In *Warth,* the absence of a causal connection between a challenged zoning law and plaintiffs' harm drew the attention of the majority. As the Court noted:

> Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.

*Warth,* 422 U.S. at 504, 95 S.Ct. at 2208.

The court denied standing finding that it could not reasonably be inferred that plaintiffs would have been able to purchase homes in Penfield even in the absence of the restrictive zoning practices. Plaintiffs therefore had no standing. *Id.* at 504, 95 S.Ct. at 2208.

The court concludes plaintiffs' allegations of injury are premised on a generalized discontent with the racial composition of the southern suburbs and not on particular instances of discrimination directed at particular dwellings in their neighborhood. Further, defendants do not control the forces necessary to remedy plaintiffs' alleged injuries. Defendants do not control housing availabilities area-wide or the personal choices of individuals. The same properties that are available for sale by defendants are also available to other realtors in the area through the Multiple Listing Service.

It is also clear that other factors and acts of third parties have caused or contributed to the lack of integration which forms the basis of plaintiffs' alleged harm. Christine Klepper, in her 1980 Annual Report to Center, attributes this condition to a "legacy of segregated neighborhoods" and a "dual housing market, one for blacks and another for whites, (which) has existed for over six decades." (Deft's. Exh. No. 9). Ms. Klepper also adds to this in a related "regional image problem" and states: "[T]he southern suburbs generally have been looked upon as the 'stepchild' of the city." (Deft's. Exh. No. 9).

Plaintiffs cannot be assured that without the efforts and cooperation of third parties not before this court that their alleged injuries can be remedied. In other words, there is no assurance that absent defendants' conduct that plaintiffs would be ensured of the benefits of the integrated community which they seek. It is purely speculative whether plaintiffs' deprivation or threatened deprivation of an integrated community can be traced to defendants' alleged steering or instead is the result of numerous other factors. As a result, plaintiffs fail to meet the "fairly traceable" element of standing.

## C. Redressability

Again, assuming plaintiffs' injury is fairly traceable to defendants' conduct, the issue remains whether this court is capable of giving plaintiffs the remedy they seek: an integrated south suburbia.

Plaintiffs seek an injunction 1) prohibiting violations of Title VIII, 2) requiring defendants to provide service to all clients, 3) requiring defendants to give public notice of nondiscriminatory policies, 4) requiring defendants to affirmatively market available housing, and 5) requiring that defendants submit detailed reports on each client served.

It is at best speculative whether enjoining the defendants in the above manner would in any way redress the plaintiffs' injuries. Specifically, the evidence produced by plaintiffs through affidavits and depositions falls far short of demonstrating

that defendants' alleged racial steering is the cause or threatened cause of depriving plaintiffs of living in an integrated community. Instead, as the court noted previously, there is evidence in the record to support the inference that such conditions of which plaintiffs complain are caused by numerous other factors. The failure to establish any causal connection between the defendants' alleged illegal conduct and plaintiffs' injuries leads this court to conclude that judicial intervention will not redress plaintiffs' injuries even if the court provided the full measure of relief requested. Absent a trial on the merits and a decision favorable to the plaintiffs, the court will not speculate as to what would be required to create an area where the racial composition would be consistent with the plaintiffs' desires. The area is too broad, the impact of defendants' conduct too attenuated, the relief requested too narrow to have the effect of creating a stable, racially-integrated community sought by the plaintiffs. There are simply too many intervening factors, historical and empirical, to suggest that the "situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." *Warth,* 422 U.S. at 507, 95 S.Ct. at 2209–10.

### V. Conclusion

The purpose of the Fair Housing Act is to ensure equal housing opportunities to all members of society regardless of race. This broad, societal purpose cannot abrogate this court's duty to ensure that its jurisdiction is properly invoked: that a real case or controversy is presented. The court's development of the standing requirements "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205. "Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States." *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). The individual plaintiffs and the Center have not suffered a distinct and palpable injury fairly traceable to the identified conduct of defendants.

They, therefore, have no standing to bring this complaint. The defendants' motion for summary judgment is granted.

IT IS SO ORDERED.