VILLAGE OF BELLWOOD, et al.,
Plaintiffs–Appellees,

v.

Chandra DWIVEDI, et al.,
Defendants–Appellants.

No. 89–1229.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1989.

Decided Jan. 30, 1990.

As Amended Feb. 28, 1990.

Rehearing and Rehearing En Banc
Denied March 2, 1990.

F. Willis Caruso (argued), Keck, Mahin & Cate, Susan L. Jantorni, Staehlin, Jantorni & Sullivan, Elizabeth Shuman–Moore, Michael J. Kalven, Chicago, Ill., Jeffrey A. Jens (argued), Wheaton, Ill., for plaintiffs-appellees.

Milo W. Lundblad (argued), Pellett, Lundblad & Baker, Chicago, Ill., for defendants-appellants.

Before WOOD, Jr., and POSNER,
Circuit Judges, and ESCHBACH,
Senior Circuit Judge.

POSNER, Circuit Judge.

The defendants in this civil rights suit—a real estate brokerage firm (Raj Realty), its owner (Chandra Dwivedi), and two of its employees—appeal from a judgment, entered after a jury verdict, for $12,000 in compensatory damages, attorney's fees of almost $72,000, and an injunction. The defendants had been charged with violating two statutes. The first, 42 U.S.C. § 1982, part of the Civil Rights Act of 1866, grants all citizens of the United States the same rights as white people with respect to property. The second, 42 U.S.C. § 3604, part of Title VIII of the Civil Rights Act of 1968, forbids (so far as potentially relevant to this case) making a dwelling unavailable to any person because of his race, § 3604(a); discriminating on racial grounds against any person in the provision of services in connection with the sale of a dwelling, § 3604(b); or falsely representing to any person because of his race that any dwelling is not available for inspection or sale. § 3604(d). The parties agree that both section 1982 and each of the above subsections of section 3604 forbid racial steering by real estate brokers, but they do not agree on what "racial steering" is.

A suburban community of some 20,000, located thirteen miles west of downtown Chicago, Bellwood was once all white but by the time of trial in 1987 was 45 percent black. The adjoining suburbs continue to have very few black residents. Many people in Bellwood are concerned that if the percentage of blacks in the community continues to increase, a point will soon be reached where the remaining whites become so uncomfortable that they exit en masse, making the community all black. The Village has energetically employed the legal tools available to it to prevent this "tipping" from taking place. Whether and by what means a community can or should prevent racial tipping, at inevitable cost to those blacks who would like to move into it even if it ends up with fewer or even no whites, is a profound social question, but is not directly presented by this appeal.

Raj Realty opened in Bellwood in 1982. More than 90 percent of its customers are black, and this has been true from the agency's inception. In 1985, officials of the Village, learning that 80 percent of the Village's new residents were black, decided to investigate a number of real estate agencies, including Raj Realty, to determine whether any of them were steering black home seekers to Bellwood and white ones to the adjoining suburbs. It retained the Leadership Council for Metropolitan Open Communities, a nonprofit corporation that promotes integrated housing, to conduct the investigation. The Council hired both black and white couples to serve as "testers." Twenty-eight of these couples went to Raj Realty, posing as customers. Their reports convinced the Council that Raj Realty was encouraging blacks to buy in Bellwood and whites to buy in the other suburbs—more precisely that Raj Realty was encouraging blacks to buy in east Bellwood and whites in west Bellwood (which is still mainly white) as well as in the white suburbs that surround Bellwood, but we ignore west Bellwood to simplify the opinion. Village, Council, and testers joined together as plaintiffs to bring this suit. (Similar suits were brought against three other real estate agencies.) The jury's verdict did not distinguish between the two statutes the defendants were charged with violating, and did not award the testers any damages.

1. There is a nonwaivable question of subject-matter jurisdiction: whether all the plaintiffs have standing under Article III of the Constitution to maintain this suit. That the Village does is settled by *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 110–11, 99 S.Ct. 1601, 1613–14, 60 L.Ed.2d 66 (1979), an earlier steering suit by the Village in which the Supreme Court detailed the various types of injury (for example to the tax base) that tipping, brought about by racial steering, can inflict—injury being the essential requirement of Article III standing. *Valley Forge Christian College v. Americans United for Separation of Church & State,*

*Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The Council's standing is established by *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); our contrary ruling in *Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013, 1017 (7th Cir.1978), on which the Supreme Court did not pass in affirming our decision, cannot stand in the face of *Havens. South Suburban Housing Center v. Santefort Real Estate, Inc.*, 658 F.Supp. 1450 (N.D. Ill.1987), which we affirmed in part and reversed in part without issuing a published opinion citable as precedent, 857 F.2d 1476 (7th Cir.1988) (table); 7th Cir.R. 53(b)(2)(iv), rejected the standing of a fair-housing agency similar to the Leadership Council because the agency's ability to provide counseling had not been impaired by the defendant's discriminatory practices. *Havens* makes clear, however, that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination. These are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination. That is especially clear in a case such as the present, where the Council was paid less by the Village than the costs incurred in the Council's investigation. Had it been paid more, it might actually have profited from the defendants' alleged misconduct!

 The standing of the testers is, as an original matter, dubious. They are investigators; they suffer no harm other than that which they invite in order to make a case against the persons investigated; there is no suggestion in this case that they were paid less to be testers than the opportunity costs of their time. The idea that their legal rights have been invaded seems an arch-formalism. *Havens*, however, holds that a tester to whom a real estate agent makes a misrepresentation forbidden by 3604(d) has standing to complain about the misrepresentation, because the statute creates a right to be free from such misrepresentations. 455 U.S. at 374,

102 S.Ct. at 1121. Congress created this right so that private persons could enforce the statute as private attorneys general without running afoul of Article III. The objective and the method are permissible. If Congress had created a system of bounties for bringing offenders to justice, bounty-hunters would have a justiciable interest in offenses committed against other persons, just as government informers have a stake in the rewards offered informers, though in both cases the plaintiff's claim is a contract claim against the government rather than a tort claim against the offender. Like the standing of informers and bounty hunters, tester standing is within the scope of the principle that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973).

 It is true that these must be *substantive* rights. Congress may not circumvent Article III by authorizing someone whose substantive rights have *not* been invaded to sue to redress an invasion of someone else's substantive rights. The statute invalidated in *McClure v. Carter*, 513 F.Supp. 265 (D.Idaho) (three-judge court), aff'd without opinion, 454 U.S. 1025, 102 S.Ct. 559, 70 L.Ed.2d 469 (1981), authorized a member of the United States Senate (Senator McClure) to bring a federal suit challenging the legality of the appointment of a federal judge (Judge Mikva). No substantive right of Senator McClure's had been invaded by that appointment; such harm as he might have sustained in common with the rest of the nation's population as a result of a judicial appointment arguably in violation of the emoluments clause (Art. I, § 6, cl. 2) was too diffuse to invade any of his legally enforceable rights. (He was not, for example, a party to any proceeding before Judge Mikva.) But Congress can create new substantive rights, such as a right to be free from misrepresentations, and if that right is invaded the holder of the right can sue without running afoul of Article III, even if he

incurs no other injury (for example, the loss of a home-buying opportunity). The distinction may seem tenuous but it is the distinction between *Havens* and *McClure*, and it binds us.

No misrepresentations were proved here. But the logic of *Havens* embraces discrimination in the provision of services, forbidden explicitly by section 3604(b) and implicitly by section 3604(a). If the plaintiffs' evidence is believed, the testers were treated in a racially discriminatory fashion, even though they sustained no harm beyond the discrimination itself, just as testers are not fooled by the misrepresentations made to them.

2. A second threshold question is whether this suit is barred by the 180–day statute of limitations in 42 U.S.C. § 3612(a) as it existed before the Fair Housing Amendments Act of 1988. (Contrary to the plaintiffs' assertion, the defendants did not waive their statute of limitations defense in the district court.) That Act extended the statute of limitations for private suits to two years. 42 U.S.C. § 3613(a)(1)(A). But since the Act itself delays its effective date for 180 days after its enactment, and since statutes of limitations are intended to secure repose for defendants—to let them go about their business, after a definite time, untroubled by fear of being sued—we are not impressed by the plaintiffs' argument that the longer statute of limitations should be applied to this case, filed years before that statute was enacted.

It is true that there is a presumption that new laws are to be applied to pending cases, *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), but the presumption is reversed when it is proposed to use a newly enacted statute of limitations to revive a previously barred claim. "[I]f a statute of limitations sets a period of two years, a subsequent statute setting a period of five years presumptively would not apply to a claim that became barred under the old law before the new one was enacted." *United States v. Kimberlin*, 776 F.2d 1344, 1347 (7th Cir.1985) (dictum). In the absence of evidence of a contrary legislative purpose, "subsequent extensions of a statutory limitation period will not revive a claim previously barred." *Davis v. Valley Distributing Co.*, 522 F.2d 827, 830 (9th Cir.1975). To same effect see *Carter v. Supermarkets General Corp.*, 684 F.2d 187, 191 n. 10 (1st Cir.1982); *Herm v. Stafford*, 663 F.2d 669, 683 n. 20 (6th Cir.1981) (contra, *Friel v. Cessna Aircraft Co.*, 751 F.2d 1037 (9th Cir.1985) (per curiam)), and with specific reference to the new statute of limitations in the 1988 amendments to the Fair Housing Act *Ragin v. Macklowe Real Estate Co.*, 126 F.R.D. 475, 479 n. 1 (S.D.N.Y.1989). The plaintiffs have presented no evidence of a congressional purpose or desire to depart from the rule. It is true that a regulation of the Department of Housing and Urban Development (not cited in the briefs or at argument) states that the 1988 amendments should be applied retroactively, *Fair Housing Complaint Processing*, 54 Fed.Reg. 3259 (1989), but the reference is to HUD enforcement rather than private enforcement, and there is no explicit mention of the statute of limitations.

Only one of the alleged acts of steering occurred within the 180–day period, except with respect to defendant Chaudhary, whom we are about to dismiss. That one act was the alleged steering of a tester couple, the Gomezes, to Bellwood. Mr. Gomez is Hispanic, and white; Mrs. Gomez is also white. However, after the defendants showed the Gomezes houses in Bellwood, the plaintiffs decided to treat Mr. Gomez for purposes of the suit as if he were black, on the assumption, which is circular, that since the defendants "steered" the Gomezes to Bellwood, they must have thought he was black. If the defendants considered both Gomezes white yet showed them houses in black neighborhoods, there was no steering—there was indeed the opposite of steering. But what race the defendants believed Mr. Gomez to be a member of was a factual question for the jury, which delivered a general verdict and thus made no separate finding of discrimination against the Gomezes. No such finding can

be inferred either, since no tester was awarded damages. But the defendants do not argue that the jury's failure to award damages to any of the testers exonerates the defendants of the charge of racial steering and makes the verdict against them incoherent.

If there was discrimination against the Gomezes (or even just against Mr. Gomez), then the essential condition for reaching back to conduct that occurred before the 180–day statute of limitations expired—at least one violation during that period—is satisfied. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989). But there must be at least that one act, which means that the jury should have been—but was not—instructed that to render judgment for the plaintiffs it had to find discrimination against one or both of the Gomezes. On this ground alone a remand is necessary. It would not be if the jury had been asked whether it found liability under section 1982 as well and had answered yes, since the parties agree that the proper "borrowed" limitations period for suits under section 1982 is two years. We need not decide whether the parties were correct to agree on this, but we point out that authority for a two-year statute of limitations for section 1982 suits brought in Illinois can be derived by combining *Baker v. F & F Investment*, 420 F.2d 1191, 1198 (7th Cir.1970), which holds that the statute of limitations is the same in section 1982 and section 1983 cases, and *Wilson v. Garcia*, 471 U.S. 261, 280, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985), which holds that the proper limitations period for the latter is the state statute governing actions for an injury to person or reputation, which in Illinois is two years. Ill.Rev.Stat. ch. 110, ¶ 13–202.

3. Indu Chaudhary questions the sufficiency of the evidence that he engaged in racial steering. Only one tester couple dealt with Chaudhary and their testimony was the entire evidence against him. The couple was black, and testified that several times while they were looking in the listings book at homes in other suburbs, Chaudhary took the book out of their hands and turned it back to the Bellwood section. This evidence was insufficient to justify a rational jury in concluding that Chaudhary had engaged in racial steering. Steering implies different treatment of testers of different races. A broker determined to "steer" all customers, of whatever race, to a particular neighborhood is not guilty of racial steering, because he is not treating the races differently. If a white tester couple had also testified about their treatment by Chaudhary, and their testimony had shown that he was not eager to sell them a house in Bellwood, then the verdict against him could stand. But as far as the evidence shows, he was treating this couple the way he treated every other couple—trying to sell them houses in the area with which he was most familiar, the area in which the real estate agency was located: Bellwood. He did not refuse to show the couple houses in the white suburbs, and did actually show them a house in one of those suburbs.

The jury's verdict was modest by usual standards, but together with the award of attorney's fees it represents a large judgment against an individual employed by a small agency to sell real estate. Chaudhary might have to pay the whole thing because he is jointly and severally liable for the entire judgment, although he would not be liable for punitive damages assessed against another defendant. This is the usual rule in tort cases, *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1146 (7th Cir.1985), and we applied it to Title VIII in *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190 n. 6 (7th Cir.1982). If, all by itself, the act of taking a listings book out of a customer's hands and turning to a section that lists homes in a community with a large representation of members of the customer's race exposes a real estate agent to liability under Title VIII, it will be hard to find people to staff real estate agencies. Chaudhary's motion for judgment notwithstanding the verdict should have been granted.

Because the case against Chaudhary should have been thrown out, the plaintiffs cannot use it to get under the bar of the

statute of limitations. This is so even though it is conceivable that Raj Realty could be guilty of using Chaudhary to steer blacks to Bellwood even if he himself was innocent. Suppose Raj had hired Chaudhary knowing that he knew nothing about other suburbs and perforce would steer all his customers—most of whom would be black because most of Raj's customers are black—to Bellwood. Then Chaudhary might be an unwitting pawn in Raj's game of steering. But the plaintiffs have not made this argument, and it is therefore waived.

4. The other defendants complain about an instruction given to the jury over their objection:

> The plaintiff need not show that the defendant intended to discriminate in order to establish his claim under Title VIII. The plaintiff will have proved that the defendant violated Title VIII if he can show, by a preponderance of the evidence, that the defendant's conduct actually or predictably had a substantial adverse impact on the group of which the plaintiff claims to be a part—that is, if he can show that the defendant's conduct was likely to have a discriminatory effect.

An instruction requiring the plaintiffs to prove the defendants' intent to discriminate was given in connection with the section 1982 charge, and if the jury had been asked to indicate which statute it was awarding damages under and had named section 1982, that would be the end of these defendants' appeal. The jury could however have found that there was no liability under section 1982, but that there was liability under section 3604 precisely because the judge had instructed it that it did not have to find an intent to discriminate in order to impose liability under *that* section. The plaintiffs properly ask us to consider the instructions as a whole, *Lynch v. Belden & Co.*, 882 F.2d 262, 267 (7th Cir.1989), but no other instruction requires the jury to find intentional discrimination in order to impose liability under section 3604, or otherwise pulls the sting from the instruction we have quoted. The question then is whether section 3604 forbids *unintentional* racial

steering—more aptly, perhaps, whether there is such an animal. If it does, and there is, the instruction was correct.

Suppose a real estate broker falsely states to a black customer that no homes are for sale in Village X, which is primarily white, and he does so because the customer is black, so that the statement is a deliberate, racially motivated falsity. By doing this he denies a dwelling to a person because of the person's race (§ 3604(a)), discriminates on racial grounds against the person in the provision of real estate services (§ 3604(b)), and misrepresents to the person on racial grounds that a dwelling is not for sale (§ 3604(d)). He is acting intentionally to prevent a black from buying a house in a white neighborhood. He is treating a black customer differently from a white one *because* the customer is black. He knows they are of different races and treats them differently because of that knowledge. This is deliberate conduct, and unquestionably it is racial steering.

■ Misrepresentation is not the only species of racial steering. If a broker simply refuses a customer's point-blank request to show him a house in a neighborhood that the broker wants to reserve for persons of a different race, this is steering even though there is no misrepresentation. The broker would be violating sections 3604(a) and (b), but not (d)—that is all. A point-blank refusal is not necessary; any effort to discourage will do. There was sufficient evidence (except against Chaudhary) to allow the jury to find violations of sections 3604(a) and (b).

■ The mental element required in a steering case is the same as that required in employment discrimination cases challenged either under Title VII of the Civil Rights Act of 1964 (and section 3604 is part of the same Act) or under 42 U.S.C. § 1981 (the standard of liability in which is similar to that in Title VII, *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1420 (7th Cir. 1986)) on a theory of disparate treatment. "Disparate treatment" means treating a person differently because of his race; it implies consciousness of race, and a pur-

pose to use race as a decision-making tool. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). "Proof of discriminatory motive is critical" in a Title VII disparate treatment case, "although it can in some situations be inferred from the mere fact of differences in treatment." *Id.* Whether or not the judge must instruct the jury that disparate treatment means intentional discrimination, he should not confuse them by equating a difference in outcome to a difference in treatment.

"Intent" is, we grant, a chameleon, a puzzle, and possibly a chimera. The judge can elide the question of intent, however, by simply instructing the jury that the unlawful conduct is treating a person differently because of the person's race, as distinct from treating a person differently because of other, noninvidious characteristics which may be correlated with race. It is that distinction which must be preserved. Maybe more people who want to live in integrated communities are black than white, but the broker who shows a black person houses in an integrated community because that person requests to see houses there is not treating him differently because of race. The instructions obliterated this distinction.

To test what *unintentional* racial steering might mean, we put the following hypothetical case to the plaintiffs' counsel. A black person comes to Raj Realty and tells the agent that he wants to know the racial composition of the various communities in the listings book because he wants to live in an integrated community. The agent answers that Bellwood is integrated but that the other suburbs are white, and he proceeds to show the customer only houses that are for sale in Bellwood. In such a case the real estate agent would not be trying to "steer" (in some invidious sense that might ground legal liability) a black person to a community that already had a large black population, unless the agent would have refused to cooperate equally if that person wanted to live in a white community. The agent would simply be trying to give the black person what that person

wanted. Yet if many black people would prefer to live in an integrated community, the effect of the agent's conduct, in combination with similar conduct by other real estate agents, could be to "tip" the community, transforming it from integrated to resegregated; or, more realistically, to fail to prevent tipping.

■ The plaintiffs' counsel told us that a real estate broker should not answer a customer's inquiry about the racial composition of the communities he serves, cf. *Zuch v. Hussey*, 394 F.Supp. 1028, 1051 n. 11 (E.D.Mich.1975), although, when pressed, said the broker could answer if he knew the exact racial composition of those communities from the census tracts. Yet nothing in the language or sparse legislative history of the statute supports an inference that it was intended either to make real estate agents speculate about the possible effects on racial patterns in housing of truthful answers to inquiries by their customers or to impose strict liability for honest mistakes in answering such questions. The statute prohibits real estate agents from refusing to show properties because of the race of the *customer*, or misleading the *customer* about the availability of properties because of his race, or cajoling or coercing the *customer* because of his race to buy this property or that or look in this community rather than that. It does not place on individual brokers the duty to solve the collective-action problem that results when brokers serving (but not encouraging) the preferences of individual customers cumulatively affect the overall racial pattern in housing.

■ A person who serves as a conduit for another person's discrimination can, it is true, be guilty of intentional discrimination, or, what is the same thing, of disparate treatment. Suppose a merchant refuses to hire black workers not because he is racist but because he believes that his customers do not like blacks and will take their business elsewhere if he hires any. The refusal is nevertheless discrimination, because it is treating people differently on account of their race. It is intentional dis-

crimination, because it necessarily is based on the merchant's awareness of racial difference and his decision to base employment decisions on that awareness. And it is actionable discrimination, regardless of its effects and notwithstanding the merchant's own freedom from racial animus. *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1181 (7th Cir.1982). Discrimination may be instrumental to a goal not itself discriminatory, just as murder may be instrumental to a goal not itself murderous (such as money); it is not any the less—it is, indeed, more clearly—discriminatory on that account. Cf. *United States v. McAnally*, 666 F.2d 1116, 1119 (7th Cir.1981).

■ The parallel in Title VIII to the merchant in our Title VII example is not, however, the broker who does his customer's bidding aware that it is influenced by racial preferences or aversions. It is the broker who refuses to show the customer a property in which the customer is interested and does so not because he dislikes persons of the customer's race but because he fears being boycotted by persons of a different race if he refuses to abide by the community's racial mores. Such a broker is discriminating against his customer on grounds of race and therefore violates the statute. But our first broker, the broker who responds to the customer's desires, is not discriminating against the *customer*, or denying the *customer* a dwelling, or misrepresenting to the *customer* the unavailability of a dwelling. The statute does not require a broker to endeavor to make his customers better people by withholding information that they request about the racial composition of the communities in which the broker sells houses. It does not impose liability for failing to promote integration, or for failing to coordinate individual integrative acts that have an aggregate resegregative effect. If the broker treats all his customers the same, regardless of race, he is not liable.

The acid test of our suggested distinction is the case where the seller of a house instructs the broker not to show the house to blacks. Obviously in following the in-

struction the broker is not discriminating against the seller, and the seller is a customer. But the broker is discriminating—on explicitly racial grounds—against his black buyer-customers to whom he refuses to show the house. He violates section 3604.

■ The plaintiffs' principal evidence that the defendants were intentionally discriminating against customers on racial grounds was the comparative experience of white and black testers. Black testers were primarily shown homes in integrated Bellwood; white testers were primarily shown homes in the adjacent white suburbs. This evidence supported but did not compel an inference that the defendants were not merely responding to their customers' desires but trying to mold those desires in order to segregate Chicago's western suburbs by race. It established a prima facie case but did not warrant a directed verdict (in which event the error in instructions would have been harmless).

■ Plaintiffs in Title VIII cases can use a method of proof similar to that which the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), created for disparate treatment cases brought under Title VII. *Phillips v. Hunter Trails Community Ass'n, supra*, 685 F.2d at 190; Kushner, Fair Housing: Discrimination in Real Estate, Community Development and Revitalization 225 (1983). They can therefore use evidence that blacks were shown primarily houses in black areas and whites primarily houses in white areas to place on the defendants the burden of giving a noninvidious reason for the difference in treatment. But customer preference, in this setting, is a noninvidious reason—a reason not forbidden by the statute—because the statute is for the protection of customers. The challenged instruction prevented the jury from considering this reason.

■ Whether it is likely that the instruction affected the outcome of the trial depends on how closely balanced the evidence was. The plaintiffs introduced a great deal of evidence, but there were gaps and puzzles, as well as contrary evidence.

*Why* for example these defendants would have wanted to discriminate in the manner they were charged with was never explained, and while an explanation was not indispensable to the plaintiffs' case, because not everything people do is rational, the absence of an explanation weakened that case. Setting aside the fact that the defendants are Indians and that people who discriminate against blacks often discriminate against Indians as well (even though Indians are Caucasian), we note that the defendants were catering to blacks, not to whites. Was it not therefore in the defendants' pecuniary interest to sell homes anywhere to blacks? If that drove whites out, all the better for the defendants' pocketbooks, since there would be more homes to sell to blacks. Although the defendants may have hoped that if enough blacks moved into Bellwood the remaining whites would leave in a panic and there would be even more homes to sell to blacks, there is no evidence that they harbored this intent and none that they engaged in "blockbusting"—that is, tried to induce whites to sell their homes by telling them that other whites were leaving and the community would soon be virtually all black. 42 U.S.C. § 3604(e); *Gladstone, Realtors v. Village of Bellwood, supra,* 441 U.S. at 110 n. 23, 99 S.Ct. at 1613 n. 23; *United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115 (5th Cir.1973). A number of the defendants' real customers (as distinct from testers) testified that they had not been steered to Bellwood because of their race. The jury did not have to believe this testimony, or if they believed it accept it as representative; but it is a further indication that this was a close enough case to make an error in jury instructions material. It was at the very least a close case with regard to the defendants' treatment of the Gomezes; and the plaintiffs *had* to convince the jury that the Gomezes had been steered, for if they were not, there was no violation of section 3604 within the limitations period and the section 3604 count would have to be dismissed even if there were conclusive evidence of earlier violations.

Here is another circumstance that weakened the plaintiffs' case, though again not fatally: since few of the defendants' customers were white, the defendants had little experience with white customers and may therefore have treated the white testers differently out of ignorance rather than design. The plaintiffs' counsel attempted to scotch this possibility in his closing argument by criticizing Raj Realty for catering to blacks, and we are disturbed by this because disparagement of a suburban real estate firm for catering to black people who want to move to the suburbs is a curious way to promote integration and a possible mask for preventing it. The line between wanting to keep black people from being "steered" into a community that already has a large black population and wanting to minimize the community's black population, period, is a fine one, but it is essential to preserve it if section 3604 is not to be perverted from its purpose of promoting integrated housing. The danger that the line will be crossed is acute if a jury is permitted to find racial steering whenever the race of a real estate broker's principal customers is correlated with the location of the houses that the broker sells them. It is difficult to see how a real estate agency that mainly serves a racial minority could protect itself from the threat of liability under Title VIII as interpreted in the challenged instruction unless it actively discouraged black people from buying homes in communities that already had many blacks—and that would be jumping from the frying pan into the fire, and inviting suit by the agency's black customers. Cf. *Smith v. City of Cleveland Heights,* 760 F.2d 720 (6th Cir.1985). It may be significant that no genuine customers of Raj Realty are plaintiffs in this suit and that the jury awarded no damages to the testers.

In contesting the proposition that Title VIII is not violated by conduct that merely has a greater adverse impact on one race than on another, the plaintiffs rely primarily on our decision in *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977). The Village of Arlington Heights,

which had almost no black residents, refused to rezone a tract to permit the construction of federally subsidized low-cost housing, which would have had a number of black residents. The court held that although there was no showing of intentional racial discrimination by the Village, the refusal to rezone would violate Title VIII if no other tract in Arlington Heights was suitable for federally subsidized low-cost housing. The analysis that led to this conclusion was in fact though not in words the "disparate impact" analysis familiar from Title VII cases. The Village had offered no strong reasons for refusing to rezone the tract in question. If, therefore, the refusal had a discriminatory impact, the failure to establish "business necessity" could, by analogy to Title VII disparate impact cases, condemn the refusal notwithstanding the absence of proof, direct or indirect, of racial animus.

Whether the analogy works, especially after the Supreme Court curtailed Title VII disparate impact liability in *Wards Cove Packing Co. v. Atonio,* — U.S. —, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); see also *Allen v. Seidman,* 881 F.2d 375 (7th Cir. 1989), is not a question we need decide. Section 3604 covers a variety of practices, well illustrated by the difference between the facts in this case and those in *Arlington Heights.* Some practices lend themselves to the disparate impact method, others not. We cannot imagine the practice (innocent in intent, discriminatory in impact, *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)) on which a disparate impact theory might be based in this case. Either the defendants deliberately tried to alter their customers' preferences in favor of a pattern of racially segregated housing, or they honestly tried to serve those preferences— and if they did the latter, but through ineptitude or sheer bad luck contributed to such a pattern in the western suburbs or (more realistically) created a risk of resegregation, they did not violate the statute. It is one thing to require a municipal government to consider the impact of its zoning decisions on the racial composition of the municipality, another to require an individual broker to consider and take steps to prevent the aggregate impact of many brokers' efforts to give individual customers what those customers want individually, though not collectively. An effective decree based on such a theory of liability would require the court to regulate a broker's dealings with his customers in minute detail.

Our decision in *Arlington Heights* has been cited for the proposition that "a significant discriminatory effect flowing from rental decisions is sufficient to demonstrate a violation of the Fair Housing Act." *United States v. Mitchell,* 580 F.2d 789, 791 (5th Cir.1978). That is correct in the sense that effect is probative of intent, *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–55 n. 15; *Sanders v. Dorris,* 873 F.2d 938, 943–44 (6th Cir.1989), so that an unexplained discriminatory effect may by itself support an inference of discriminatory intent—an insight at the heart of the *McDonnell Douglas* method of proving disparate treatment. But the passage from *Mitchell* is misleading if used to equate discriminatory effect with liability in every factual situation to which section 3604 might be applied. A generality in a judicial opinion can become a loose cannon when taken out of context; *Mitchell* was a clear case of deliberate steering, rich with misrepresentations. 580 F.2d at 791.

▆▆▆ *Heights Community Congress v. Hilltop Realty, Inc.,* 774 F.2d 135, 140 (6th Cir.1985), formulates the legal standard more precisely than *Mitchell* does: "If a statement or act would have a discriminatory effect and is made with the intent to steer, it violates section 3604(a)." Expanding on this formulation, we hold that (1) a real estate broker who treats customers differently from one another because of their race violates Title VIII; (2) even without direct evidence of such difference in treatment, if the broker sells blacks houses in black neighborhoods and whites houses in white ones and he can offer no noninvidious reason (such as customer preference) for this pattern, then an inference of disparate treatment can be drawn

from the discriminatory effect. But discriminatory effect is not, as the challenged instruction conveyed, the violation; it is merely evidence of violation.

Some comments at oral argument, especially the statement by the plaintiffs' counsel that he does not "think that very many people are really interested in race in looking for housing," make us wonder about the good faith of this suit. There unquestionably is discrimination in housing against blacks in this country today. Yinger, *Measuring Racial Discrimination With Fair Housing Audits: Caught in the Act*, 76 Am.Econ.Rev. 881 (1986); Galster, *More Than Skin Deep: The Effect of Housing Discrimination on the Extent and Pattern of Racial Residential Segregation in the United States*, in Housing Desegregation and Federal Policy 119 (Goering ed. 1986); Massey & Denton, *Trends in the Residential Segregation of Blacks, Hispanics, and Asians: 1970–1980*, 52 Am.Soc.Rev. 802 (1987); Darden, *Socioeconomic Status and Racial Residential Segregation: Blacks and Hispanics in Chicago*, 28 Int'l J.Comp.Soc. 1 (1987); H.R.Rep. No. 711, 100th Cong., 2d Sess. 15 (1988). The plaintiffs' counsel—who has represented the Village of Bellwood in its other housing cases before this court and the Supreme Court—is well aware of this fact. Earlier in this opinion we remarked the danger that Title VIII might be used to achieve objectives opposite to those stated by its framers, and specifically might conduce to a system of "benign" quotas not perceived as benign by the intended beneficiaries, including blacks who might like to live in Bellwood even though their presence would increase the percentage of blacks living there. Our suspicions are not grounds for reversal. But they reinforce our belief that these cases should be tried under instructions that require the jury to find disparate treatment before it can impose liability, under a statute designed to promote rather than retard integration, on real estate agents who are attempting to find suburban housing for blacks.

For the guidance of the district judge on remand, we suggest the following instruction. This is just a suggestion; we do not want to put the judge in a straitjacket.

If you find that the defendants treated their black and white customers differently on account of the customers' race, or in other words if you find that the defendants were influenced by a customer's race in deciding whether to show the customer properties in one area or another, then you should conclude that the defendants engaged in racial steering in violation of section 3604. Even if you decide that there is no or insufficient direct evidence of a racially motivated difference in treatment, if you find that the defendants showed their black customers primarily homes in predominantly black areas, and their white customers primarily homes in predominantly white areas, and if, in addition, you do not believe the defendants' explanation of this pattern, then you may infer that the defendants were steering their customers racially, in violation of the statute. If you do not find that the defendants treated their white and black customers differently on account of their race, then your verdict should be for the defendants. For purposes of this instruction, the tester couples were customers of the defendants even though they were not really interested in buying homes but were merely investigating the defendants' practices.

The judgment is reversed with directions to vacate the injunction, to enter judgment for defendant Chaudhary, to grant a new trial to the remaining defendants, and to vacate the award of attorney's fees pending the outcome of the new trial.

REVERSED AND REMANDED WITH DIRECTIONS.