FAIR HOUSING COUNCIL,
INC., et al, Plaintiffs,

v.

VILLAGE OF OLDE ST. ANDREWS,
INC., et al., Defendants.

CIVIL ACTION NO. 3:98–CV–630–H.

United States District Court,
W.D. Kentucky,
At Louisville.

March 14, 2003.

Thomas A. Ebendorf, Barber, Banaszynski & Associates, Galen A. Martin, Kevin James Kijewski, C. Alex E. Rose, Kentucky Fair Housing Council, Inc., Louisville, KY, for Plaintiffs.

Stuart E. Alexander, III, William A. Buckaway, Jr., William Joseph Walsh, IV, Tilford, Dobbins, Alexander, Buckaway & Black, Jerrold R. Perchik, Greenebaum Doll & McDonald, Walter J. Swyers, Jr., Louisville, KY, for Defendants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiffs, the Fair Housing Council, Inc. ("FHC") and the Center for Accessible Living, Inc. ("CAL"), (collectively referred to as "Plaintiffs"), seek relief pursuant to the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.* According to Plaintiffs, Defendants, the Village of Olde St. Andrews, Inc., WKB Associates, Inc., and Kenneth R. Brown, failed to design and construct three different multifamily residential developments so as to be accessible to handicapped persons as required by the FHAA.[1] The parties have filed cross motions for summary judgment. In their motion, Plaintiffs argue for judgment as a matter of law as to liability. Such a ruling would leave a trial only to determine damages.[2] Defendants argue most vigorously for dismissal due to Plaintiffs' lack of standing. Defendants also maintain that they are entitled to a judgment as a matter of law because the FHAA does not apply to their developments, and that even if the Court determines that the FHAA generally applies to the subject developments, a portion of Plaintiffs' claims is nonetheless barred by the applicable two year statute of limitations. Lastly, Defendants argue that partial summary judgment in favor of Plaintiffs is inappropriate because there are unresolved issues of material fact as to liability.

In the course of the foregoing discussion and analysis, the Court concludes that Plaintiffs have standing to maintain this action based on applicable Sixth Circuit precedent, and that the FHAA generally applies to each of the three developments. The Court also concludes that Plaintiffs'

---

1. The Court is aware of and sympathetic to the fact that some disabled persons find the term "handicapped" objectionable. (Pls.' Mem. Supp. Mot. Summ. J. at 2 n. 2.) "Handicapped" is the term used by Congress in the applicable portions of the FHAA. *See* 42 U.S.C. § 3604(f). Accordingly, for the purpose of clarity and consistency, the Court will use the term "handicapped" in this opinion. The Court's use of this term should not be viewed in a derogatory or negative light.

2. During oral argument on the summary judgment motions, the parties agreed to allow the Court, instead of a jury, to decide all issues, including damages, should this case reach trial.

claims are not barred by the statute of limitations. As to liability, the Court finds that a trial is necessary to resolve several disputed issues of material fact.

## I.

Plaintiff FHC is a nonprofit corporation whose purpose is to promote the equal availability of housing to all persons without regard to race, color, religion, gender, national origin, familial status, or disability, and to take all appropriate action in furtherance of this goal. It identifies barriers to fair housing and helps counteract and eliminate discriminatory housing practices in Kentucky and southern Indiana. It provides several education, counseling and referral services. FHC also tests housing developments to monitor the amount and scope of housing discrimination in the greater Louisville area. During the relevant time period, FHC received grants from the United States Department of Urban Housing and Development ("HUD") for enforcing the fair housing laws and to educate the community about fair housing.

Plaintiff CAL is also a Kentucky nonprofit corporation which supports individuals with disabilities in attaining independent living and in broadening their right to choose their personal degree of independence. CAL advocates expanding the range of independent living options available to such persons, educating the community about the needs of persons with disabilities, assisting persons with disabilities to seek and obtain an independent lifestyle, and advocating for the full exercise of the statutory and constitutional rights of persons with disabilities.

Defendant the Village of Olde St. Andrews, Inc. is a Kentucky nonprofit corpo-

ration. It is the homeowner's association for the Village of Olde St. Andrews development. Defendant WKB Associates, Inc. is a Kentucky corporation engaged in the business of building homes in Jefferson County, Kentucky. WKB is the builder of the three developments at issue in this action. Defendant Kenneth R. Brown is an architect. He has been licensed in Kentucky since approximately 1982. Brown served as the architect for the three developments at issue in this action.

## A.

Between 1993 and 2001, WKB Associates and Brown designed and constructed three condominium developments in Jefferson County, Kentucky: (1) Greenhurst Condominiums ("Greenhurst"); (2) the Village of Olde St. Andrews ("Olde St. Andrews"); and (3) the Village of Deer Creek ("Deer Creek"). All three developments share a similar design layout. The units or homes are arranged according to a "pinwheel" design, with two units joined at the middle by four garages.[3] The garages are separated by smoke walls into quadrants. There are no common entrances. Each unit and garage has its own entrance. The four units and their corresponding garages share a common roof.

In 1997, the FHC began searching for violations of the FHAA at any new multifamily housing location it identified in the Jefferson County, Kentucky area. HUD provided funding specifically for this purpose. The FHC's investigation of the subject developments began with the Village of Olde St. Andrews, which came to organization's attention on July 22, 1998. The FHC selected the Village of Olde St. Andrews because of the steps in front of its

---

**3.** The Court uses the terms "units," "homes," and "dwellings" interchangeably in this Opinion.

homes. Prior to the investigation and lawsuit, Plaintiffs received no complaints from any purchasers or potential purchasers concerning homes built or designed by Defendants. CAL provided "testers" to the FHC to conduct the investigation of the Village of Olde St. Andrews. Testing took place between August 17, 1998, and September 1, 1998. FHC paid the three testers approximately $25 per test. The testers were also generally paid $25 each for "tester" training that occurred prior to the actual on-site testing. Plaintiffs' staff debriefed the testers immediately following the tests.

The tests revealed what Plaintiffs perceived as numerous violations of the FHAA at the Village of Olde St. Andrews. As a result, Plaintiffs filed suit against Defendants on October 16, 1998, for failing to design and construct Olde St. Andrews so as to be accessible to handicapped individuals in violation of the FHAA. After filing suit, Plaintiffs retained an FHAA accessibility expert and architect, Phil Zook, to conduct on-site investigations and evaluations of Olde St. Andrews, Greenhurst, and Deer Creek. Zook conducted each investigation on July 20, 1999. Zook's investigation revealed numerous alleged violations of the FHAA at all three developments. As a result, Plaintiffs amended their original complaint to include allegations against Defendants for violating the FHAA in the design and construction of Greenhurst and Deer Creek in addition to Olde St. Andrews. Plaintiffs are seeking compensatory and punitive damages, as well as equitable relief from the Court to remedy the alleged deficiencies in the three developments.

**B.**

Greenhurst was completed in 1995. It consists of 156 condominium homes. Of these, 100 are single story walk out patio homes and 56 are one and half story patio homes. Zook identified several "deficiencies" in the design and construction of the Greenhurst units that Plaintiffs allege violate the FHAA including: inaccessible common use areas,[4] inaccessible building entrances caused by 6" – 8" steps at the entrance thresholds of the units as well as steps at some entrance sidewalks, impermissibly narrow doorways, unusable knobbed hardware on some doors, electrical outlets and environmental controls installed at improper reach ranges, no reinforcements in bathrooms to allow for later installation of grab bars, and inaccessible location of the sinks in kitchen corners so that there is not a clear space of 30" × 48" floor area parallel to and centered on each sink. Construction at the Greenhurst development was totally complete at the time of Zook's visit, and all the units had been sold and were occupied.

Olde St. Andrews was completed in 1999. It consists of 112 condominium homes. Of these, 94 are single story patio homes, and 18 are two story townhouse homes. Zook identified several "deficiencies" in the design and construction of the Olde St. Andrews units that Plaintiffs allege violate the FHAA including: inaccessible public and common use areas,[5] inaccessible building entrances caused by 6" – 8" steps at the entrance thresholds of the units as well as steps at some entrance sidewalks, impermissibly narrow doorways, electrical outlets installed at improper reach ranges, no reinforcements in bathrooms to allow for later installation of

---

**4.** According to Zook's report, the common use areas at Greenhurst include a pool, clubhouse, sidewalks, and parking areas.

**5.** According to Zook's report, the common use areas at Olde St. Andrews include a pool, clubhouse, sidewalks and parking areas.

grab bars, bathrooms that do not have sufficient maneuvering space around the toilet or shower, and kitchen plans that place the sinks in an angled section of the corner so that there is not a 30″ × 48″ clear floor space parallel to and centered on the sinks. At the time of Zook's inspection, the Olde St. Andrews project was nearing completion and almost one-hundred percent occupied with only a few buildings remaining to be finished and sold.

Deer Creek was completed in 2001. It consists of 64 dwelling units all of which are single story ranch style homes. The only permanent "deficiency" identified by Zook in the design and construction of the Deek Creek units at the time of his visit that Plaintiffs allege violates the FHAA are master baths which do not have requisite maneuvering space around the toilet or shower. At the time of Zook's inspection only eight units at Deer Creek had been completed. Defendants contend that upon receipt of Zook's Deer Creek compliance review, Defendant Brown modified the plans so that the remaining 56 units comply with the HUD guidelines in every respect.

## II.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The issue is whether the evidence submitted presents a sufficient disagreement about the material facts so that submission to trier of fact is necessary, or whether the evidence is so one-sided that a party must prevail as a matter of law. Id. at 251–52, 106 S.Ct. 2505.

## III.

■■■ Before considering any other issue, the Court first addresses whether Plaintiffs have standing to maintain this action. See American Fed'n of Gov't Employees, Council of Prison Locals, Local 1286 v. U.S. Dept. of Justice, 738 F.2d 742, 748 (6th Cir.1984). The standing inquiry generally entails a two-step analysis involving "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). However, the Court need not consider the "prudential standing" requirements in this case because Congress has declared that standing under the Fair Housing Act extends to the full limits of Article III. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). To satisfy the standing requirement of Article III, "a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." Bennett, 520 U.S. at 162, 117 S.Ct. 1154 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

## A.

To understand how this general rule applies to organizations such as Plaintiffs, it is necessary to consider in some detail the facts and rulings of five key cases.

The foremost of these cases is Havens Realty Corp. v. Coleman. In Havens, the

Supreme Court specifically addressed the injury requirement for organizational standing under the FHAA. *Id.* at 363, 102 S.Ct. 1114. There, a realty company and one of its employees were alleged to have engaged in racial "steering" in violation of the Fair Housing Act. *Havens*, 455 U.S. at 366, 102 S.Ct. 1114. The plaintiffs included a housing organization, Housing Opportunities Made Equal ("HOME"), whose mission was very similar to Plaintiffs' mission. *Id.* at 368, 102 S.Ct. 1114. HOME alleged that the defendant's racial steering practices "frustrated the organization's counseling and referral services with a consequent drain on resources." *Id.* at 369, 102 S.Ct. 1114. The district court had sustained defendant's motion to dismiss on standing grounds. The Supreme Court held that the type of injury alleged by HOME was sufficient for the purposes of establishing a cognizable Article III injury at the initial pleading stage:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organizations's activities—with the consequent drain on the organizations's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379, 102 S.Ct. 1114.

Eight years after *Havens*, then Judge Ruth Bader Ginsburg, writing for the D.C. Circuit Court, provided an extensive discussion of organizational standing under the Fair Housing Act in *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C.Cir.1990). The plaintiffs were non-profit organizations "dedicated to ensuring equality of housing opportunity through education and other efforts." *Id.* at 26. They alleged that an advertising agency and the owner and manager of a residential condominium development ran discriminatory housing advertisements in *The Washington Post* in violation of the Fair Housing Act. *Id.* The plaintiffs also alleged that these discriminatory ads required plaintiffs to "devote scarce resources to identify and counteract defendants' advertising practices" and also required "increased educational efforts" to inform the public about laws prohibiting discrimination in housing. *Id.* at 28. Once again, the district court had dismissed the action on standing grounds. *Id.* at 26. The D.C. Circuit reversed, finding that educational programs "could plausibly be required" to counteract defendants' conduct and that these programs would act as a drain on the organizations' resources. *Id.* at 28–29. Therefore, plaintiffs' allegations were sufficient to establish standing to sue. *Id.* at 28–29, 31.

The court, however, specifically rejected the notion that an organization could "manufacture" standing by alleging that the costs of the litigation itself comprise its injury: "[a]n organization, cannot of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." *Id.* at 27. A plurality of other circuits, at least, have adopted a similar view. *See also, Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 79 (3rd Cir.1998) ("We align ourselves with those courts holding that litigation expenses alone do not constitute damage sufficient to support standing."); *Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions

or inactions of another party is insufficient to impart standing upon the organization."); *Walker v. City of Lakewood,* 272 F.3d 1114, 1124 n. 3 (9th Cir.2001) ("Because we agree that a plaintiff cannot establish standing simply by filing its own lawsuit, we will not consider the time and money the FHF has expended in prosecuting this suit in deciding if the FHF has standing.").

Not all circuits have reached the same conclusions as *Spann,* however. The Seventh Circuit held that organizational standing can flow automatically from the expenses associated with litigation. *See Village of Bellwood v. Dwivedi,* 895 F.2d 1521 (7th Cir.1990). In *Bellwood,* a real estate brokerage firm and two of its employees were sued for discriminatory practices alleged to violate the Fair Housing Act. *Id.* at 1525. On appeal of a jury verdict in favor of the plaintiffs, the court considered whether the organizational plaintiff had Article III standing to sue under the Fair Housing Act. *Id.* at 1525. Also, relying on *Havens,* the Seventh Circuit held that the organization did have standing because the "only injury which need be shown to confer standing on a fair housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Id.* at 1526. Notably, the Seventh Circuit imposed no requirement that the injury be independent or separate from the litigation. *See also, Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898 (2nd Cir.1993).

Without significant elaboration or discussion, the Sixth Circuit referenced the *Spann* approach in *Housing Opportunities Made Equal Inc., v. Cincinnati Enquirer, Inc., a Division of Gannett Co., Inc.,* 943 F.2d 644 (6th Cir.1991). The Sixth Circuit held that in a Fair Housing Act case an organization must allege that the defen-dant's discriminatory conduct has caused it to suffer some injury "independent of its suit challenging the action." *Id.* at 646. However, the court gave minimal treatment to the standing issue. It held only that allegations that the defendant's discriminatory housing advertisement had "deterred potential renters from seeking housing at the advertised complexes" which in turn caused the plaintiff "to devote resources to investigate and negate the impact of these advertisements" were sufficient for standing purposes. *Id.* The Court did not discuss precisely what other types of allegations are sufficient to establish an injury independent of the litigation.

The Sixth Circuit revisited the question of organizational standing under the Fair Housing Act in *Hooker v. Weathers,* 990 F.2d 913 (6th Cir.1993). In *Hooker,* the managers and owners of a trailer park were sued for discriminating against individuals on the basis of familial status in violation of the Fair Housing Act. *Id.* at 914–15. The complaint alleged that the Hookers, a married couple, owned a trailer located at the Shamrock Motel and Trailer Park managed by defendant Terry Weathers. *Id.* at 914. After Mr. Hooker's elderly father moved out of the trailer, the Hookers tried to rent or sell the trailer. *Id.* The Hookers alleged that the defendants frustrated these efforts by discriminating against prospective renters and buyers on the basis of age and familial status. *Id.* Mr. Hooker contacted plaintiff, the Fair Housing Contact Center ("FHCS"), concerning his difficulties. *Id.* In an affidavit, Hooker alleged that as a result of his complaint the FHCS investigated the trailer park by sending a tester to inquire about moving into the trailer. *Id.* The tester was allegedly told that she was too young to rent the trailer. *Id.* As a result, the Hookers and FHCS filed suit. *Id.* The district court granted defendants' motion to dismiss for lack of standing.

The only allegations of actual injury suffered by the FHCS centered around its pre-litigation investigation. *Id.* at 914–15. Again citing *Spann,* the Sixth Circuit summarily found that such allegations were sufficient to satisfy the Article III injury in fact requirement:

> According to the complaint, "Fair Housing Council Service conducted an investigation, and confirmed the facts and circumstances alleged [in the complaint]." FHCS devoted resources to investigating the defendants' practices and alleges that it has confirmed that defendants do discriminate on the basis of familial status. Therefore, FHCS has standing.

*Id.* at 915. On its face, Plaintiffs here appear to have alleged a similar level of "injury" as the *Hooker* plaintiffs. The Sixth Circuit has not considered another FHAA organizational standing case since *Hooker.*

 Another significant factor in the standing analysis is that the Court now considers the issue on summary judgment.[6] While there can be no dispute that the Plaintiffs' injury allegations were sufficient to withstand a motion to dismiss, (Memorandum Order of 02/12/1999 at R. 13), something more than mere allegations is required at the summary judgment stage. *See Fair Housing Council of Suburban Philadelphia,* 141 F.3d at 76. "Since the elements of standing are not

mere pleading requirements but rather an indispensable part of plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.* with the manner and degree of evidence required at the successive stages of litigation." *Id.* (*citing Lujan,* 504 U.S. at 561, 112 S.Ct. 2130). Even the *Havens* Court was careful to point out that HOME would have to produce actual evidence to support its allegations if it wanted to prevail on the standing issue at a later stage in the litigation. *Havens,* 455 U.S. at 379 n. 21, 102 S.Ct. 1114. Other courts' have also noted the need of evidentiary support for injury allegations.[7] *See, e.g., Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd. Co.,* 160 F.3d 433, 434 (8th Cir.1998).

### B.

Plaintiffs do not support their standing claim with affidavits and only Defendants appear to cite to the depositions of Plaintiffs' employees. Without a single citation to the record, Plaintiffs categorized their injuries in the following manner:

> Because of the Defendants' actions, the Plaintiffs were forced to divert resources away from education and housing counseling programs to investigate and attempt to counteract the discrimination against persons with disabilities carried out by the Defendants. Specifically, pri-

---

6. This not the first the first time the Court has considered this issue during the course of this litigation. After Plaintiffs filed their complaint, Defendants moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) arguing that the action should be dismissed because Plaintiffs did not meet the standing requirements of Article III. After reviewing Plaintiffs' complaint and applicable case law, the Court denied Defendants' motion because Plaintiffs' complaint was fraught with buzzwords and phrases from *Havens* and *Spann.* The Court was careful to note, however, that "if the

evidence adduced later demonstrates that plaintiffs' injuries were related only to bringing this lawsuit, the Court will revisit a properly raised challenge to the plaintiffs' standing at that time." (Memorandum Order of 02/12/1999 at R. 13.)

7. In *Spann,* for instance, it appears that plaintiffs submitted numerous affidavits setting out in some detail the kinds of organization damage attributable to defendants' FHAA violations. *Spann,* 899 F.2d at 28–29.

or to this litigation, the Plaintiffs recruited disabled testers to investigate the violations of the Fair Housing Act at the subject properties, developed a new testing methodology for investigating accessibility violations, trained testers in the methodology, made numerous site visits to the subject properties, assigned testers, made copies of test forms, debriefed testers, conducted research into the designers and developers of the subject properties, reviewed the plans of the subject properties, conducted legal research into the accessibility requirements of the Fair Housing Act, in addition to dozens of other activities prior to litigation. These activities diverted both the Plaintiffs' monetary and human resources away from other projects. Plaintiffs had to suspend certain education enforcement, and counseling projects to divert staff time and money to this case. Specifically, the Fair Housing Counsel had to divert resources away from its education projects, including the *National Fair Housing Advocate,* its annual school desegregation report, its local newsletter concerning fair housing issues, and other staff reports and activities. Because of the enormity of this case, and the multiple accessibility violations present at the subject properties, the Fair Housing Counsel was forced to divert a good deal of the resources available under its enforcement program to the investigation of the Defendants and the subject properties.

(Pls.' Resp. Defs.' Mot. Summ. J. at 6–7.)

■ The Court first addresses Plaintiffs' claim that they were damaged by having to divert funds from other projects such as education and counseling to fund this litigation. This appears to be the very type of "manufactured" injury *Spann* declined to accept because the costs associated with the pursuit of litigation alone cannot create an injury sufficient to establish standing under Article III. *See Spann,* 899 F.2d at 27. In any event, Plaintiffs' claim probably fails for a lack of proof. Although pressed to do so in discovery and oral argument, Plaintiffs could only identify that the potential costs associated with litigation generally effected publication of the *National Fair Housing Advocate,* their annual school desegregation project and their local newsletter concerning fair housing issues. But they do not quantify, or even identify, the resources diverted from these programs or describe the effect this litigation had on these programs. Furthermore, the actual evidence adduced during discovery strongly contradicts Plaintiffs' diversion claim. Plaintiffs generally received two separate funding grants from HUD, one for enforcement activities, and one for education activities. Plaintiffs were not funded for educational projects between September 15, 1998, and 2001. Thus, it appears that a dearth of funding for educational programs actually prevented continued publication of the *National Fair Housing Advocate* and curtailment of Plaintiffs' other educational programs not the costs associated with this litigation.

■ Plaintiffs' claim that they suffered cognizable injury when forced to expend resources to investigate Defendants' alleged discriminatory conduct is a much closer question. The record reveals that the "investigation" to which Plaintiffs refer consisted of training and sending three testers to the Olde St. Andrews development to conduct on-site accessibility tests. Plaintiff CAL supplied the testers, and Plaintiff FHC paid the testers $25 each.[8] Each tester was also paid approximately

---

**8.** Because Plaintiffs did not include any citations to the record in their briefs, the Court

$25 for training prior to conducting the test. (Baize Dep. at 7–8). This is the only actual evidence the Court finds in the record that supports Plaintiffs' allegations of investigation costs incurred prior to litigation.

Relying heavily on *Spann*, Defendants argue that this type of evidence is insufficient because the Plaintiffs' "investigation" was undertaken solely in anticipation of litigation, was an essential part of the litigation itself and, therefore, was not *independent* of the injuries associated with the litigation itself. *See Spann*, 899 F.2d at 27. Defendants contend that the pre-litigation investigation in this case is just as "manufactured" as the cost of the litigation itself, and will render the Article III requirements meaningless because any organization can create standing merely by "investigating" the claim before filing suit. Defendants' argument has a good deal of appeal, especially in this case. If it was not for this rule, any organization could manufacture Article III standing merely by filing suit. *See id.* Here it appears that Plaintiffs' investigation efforts were no more than a necessary precursor of this litigation. As Defendants point out, after the investigation Plaintiffs did not even make an attempt to contact any of the Defendants before filing this lawsuit.

▇ Although Defendants arguments are very persuasive, the Court cannot ignore that in *Hooker* the Sixth Circuit found standing in a case very similar to the present. *See Hooker*, 990 F.2d at 915.

There, the only apparent allegation of injury was pre-litigation investigation expenses for testers who confirmed defendants' allegedly discriminatory conduct. *Id.* 914–15. Although not entirely clear, the *Hooker* plaintiff appears not to have taken any action based on its investigation other than filing suit. *Id.* Citing *Spann*, that court held: "FHCS devoted resources to investigating the defendants' practices and alleges that it has confirmed that defendants do discriminate on the basis of familial status. Therefore, FCHS has standing." *Id.* at 915. Although the opinion contains little discussion, the holding itself strongly suggests that the Sixth Circuit favors a less restrictive standing requirement for enforcement of the fair housing laws. Moreover, the result is consistent with the strong policy rationale that "the policies of the Act and the concrete injuries alleged by the plaintiff organization ... intertwine to support plaintiff's standing to bring this suit." *Spann*, 899 F.2d at 31.

If it were not for the *Hooker* opinion, the Court would almost certainly conclude that the pre-litigation investigation in this case is insufficient to establish standing under Article III. However, following *Hooker* the Court concludes that Plaintiffs have standing by virtue of the expenses they incurred in conducting their pre-litigation investigation.

## IV.

Defendants argue that they are entitled to judgment as a matter of law because the

had to extensively review deposition testimony and other discovery related documents. Organizational plaintiffs should bear in mind that standing is not an issue to be taken lightly. An organization should not assume that it automatically has a right to litigate a Fair Housing Act claim merely because the organization is theoretically opposed to housing discrimination. Article III standing is necessary in every case. In fact, the Court

has an affirmative obligation to ensure that all plaintiffs have standing even where the issue is not raised by the parties themselves. *See In re Cannon*, 277 F.3d 838, 852 (6th Cir.2002) ("Constitutional standing 'is always a threshold inquiry' that a court must consider before exercising jurisdiction.") (*quoting Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 922 (6th Cir.1988)).

FHAA does not cover any of the units in the three subject developments. To answer this question, the Court first turns to the applicable provisions of the Act. The design and construction requirements of the FHAA apply only to new construction of multifamily dwellings built for first occupancy after 1991. *See* 42 U.S.C. § 3604(f)(3)(C). As used in this section of the FHAA, "covered multifamily dwellings" mean: "(A) buildings consisting of 4 or more units if such buildings have one or more elevators; and (B) ground floor units in other buildings consisting of 4 or more units." 42 U.S.C. § 3604(f)(7). None of the buildings in Defendants' developments contain elevators. Thus, the applicability of the FHAA in this case depends on whether Defendants' ground floor units are located in buildings consisting of 4 or more units. *See id.*

Defendants argue that its homes or units are not constructed in "buildings of consisting of 4 or more units" because the homes are structurally separate from one another. Defendants' homes are clustered together in a pin-wheel design. There are 4 homes in each pin-wheel. Defendants maintain that the clusters should be considered as 2 separate buildings consisting of 2 homes each joined in the middle by 4 garages because 2 separate foundations are laid for each cluster. Defendants admit that each cluster of 4 homes shares the same roof. Therefore, if the Court were to accept Defendants' argument, the design and construction requirements of the FHAA would not govern any of Defendants' units because the buildings contain less than 4 units. *See id.* The FHAA does not directly address whether Defendants' configuration should be considered a

single building of 4 homes or 2 separate buildings of 2 homes each.

HUD is the federal agency primarily charged with the implementation and administration of the FHAA. *See* 42 U.S.C. § 3608. Congress directed HUD to provide technical assistance in the implementation of the requirements of 42 U.S.C. § 3604(f)(3)(C). *See* 42 U.S.C. § 3604(f)(5)(C). HUD, thereafter, issued Fair Housing Accessibility Guidelines (the "Guidelines") which are set forth at Vol. 56, No. 44 Fed.Reg. at 9472–9515 (March 6, 1991) (codified at 24 CFR Chapter I, Subchapter A, Appendix II and III). The Guidelines specify that "dwelling units separated by firewalls do not constitute separate buildings" for purposes of the term "covered multifamily dwellings." 56 Fed. Reg. at 9480. Additionally, HUD's *Fair Housing Design Manual of 1998 ("Design Manual")* provides that:

> Dwellings built within a single structure but separated by a firewall are treated under the Fair Housing Act as a single building. For example, a structure containing two units on each side of a firewall would not be regarded as four two-unit buildings (and thus not covered by the Guidelines) but as a single eight-unit building. In other situations where the dwelling units are connected, such as by stairs or a walkway that is structurally tied to the main body of the building for purposes of the Guidelines, they are considered a single building and ground floor units in such buildings without elevators are covered.

*Design Manual* at 10. Given the broad remedial purpose of the Fair Housing Act, the Court is persuaded that HUD's interpretation of the FHAA concerning multifamily dwellings is reasonable and entitled to deference.[9]

9. The Court should defer to HUD's official interpretation of the FHAA in its Guidelines so long as it appears reasonable. *See Meyer v.*

*Holley,* —— U.S. ——, 123 S.Ct. 824, 830, 154 L.Ed.2d 753 (2003) (stating that HUD's interpretation of FHAA was entitled to deference

■ Defendants' units are structurally connected by a single roof. While the dwellings may be separated by a firewall, this fact does prevent them for being considered as a single building. *See* 56 Fed. Reg. at 9480; *Design Manual* at 10. Each cluster of 4 units must but be considered a single building for purposes of the design and construction requirements of FHAA. Accordingly, all Defendants' units are covered by the Act with the exception of the multi-story units.[10]

## V.

Defendants argue that even if the Court concludes that all three developments are subject to the FHAA, Plaintiffs' claims as to all but nine of the units at Greenhurst are barred by the applicable two year statute of limitations. The sales on these units closed prior to October 6, 1996, more than two years before this action was filed. Plaintiffs argue that the continuing existence of FHAA non-compliant buildings constitutes a continuing violation under the FHAA. Once again, the Court begins its analysis with the plain language of the statute.

■ A plaintiff must file a FHAA complaint within two years after the "occurrence or termination of an alleged discriminatory housing practice . . . whichever occurs last." 42 U.S.C. § 3613(a)(1)(A). "[T]he plain language of the FHA indicates that an act, whether one in a series of many, or a single discrete occurrence, is necessary within the limitations period or the claim falls outside of the statute of limitations." *Moseke v. Miller and Smith, Inc.*, 202 F.Supp.2d 492, 503 (E.D.Va.2002) (analyzing plain language of FHAA's statute of limitations).

Accordingly, the Court must determine what discriminatory "act" is actually at issue here. The FHAA makes it unlawful to "discriminate in the sale or rental, or otherwise make unavailable or deny a dwelling to any buyer or renter" or "to discriminate against any person in terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" on the basis of a handicap. *See* 42 U.S.C. §§ 3604(f)(1)-(2). Discrimination includes: "in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1998, a failure to design and construct those dwellings in such a manner" as prescribed by the FHAA. *See* 42 U.S.C. § 3604(f)(3)(C). Plaintiffs maintain claims under this subsection. Thus, the "act" at issue here is the design and construction of covered multifamily dwellings for sale or rental. The Court must determine when the last "act" of discrimination occurred, which must not be confused with the last effects of the discrimination. "The proper emphasis here must remain on Defen-

---

under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) so long as HUD's interpretation was reasonable); *see also, Trafficante v. Metropolitan Life Ins.*, 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (stating specifically that HUD's interpretations of the language of the Fair Housing Act are entitled to great weight.) Furthermore, informal agency interpretations such as the *Design Manual* while not necessarily entitled *Chevron*-style deference are "entitled to respect . . . to the extent that those interpretations have the power to persuade." *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

10. Multi-story units are not covered and do not have to comply with the design and construction requirements of the FHAA. *See Design Manual* at 9 ("To be a covered unit, all of the finished living space must be on the same floor, that is, be a single-story unit.")

dant's acts (*i.e.*, the design and construction of non-compliant buildings), rather than the continuing effects (*i.e.*, the continuing inaccessible features) that those acts caused." *Moseke*, 202 F.Supp.2d at 505.

In *Havens* the Supreme Court recognized that "where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely filed" when it is filed within two years of the last asserted occurrence of that practice. *Havens*, 455 U.S. at 380–81, 102 S.Ct. 1114. Here, the unlawful practice at issue is the design and construction of multifamily housing for sale or rental. The last asserted occurrence of the practice in the Greenhurst development complex occurred when the last unit was sold which occurred within two years of this suit. *See Baltimore Neighborhoods, Inc., v. Rommel Builders, Inc.*, 40 F.Supp.2d 700, 710 (D.Md.1999) (holding that Fair Housing Act statute of limitations begins to run in design and construction cases with the sale of last allegedly deficient unit). Because at least one incident of alleged discrimination occurred during the limitations period, none of Plaintiffs' claims are barred by virtue of the continuing violation doctrine. *See Havens*, 455 U.S. at 381, 102 S.Ct. 1114. The continuing violation doctrine does in fact apply so long as there is some ongoing *act* being performed as it pertains to the design and construction of the development.[11] The mere existence of a non-compliant

building, however, is not an act. *But see, Eastern Paralyzed Veterans Assoc. v. Lazarus–Burman Associates*, 133 F.Supp.2d 203 (E.D.N.Y.2001) (holding to the contrary without significant analysis). The statute of limitations for organizations alleging this type of discriminatory practice begins to run in design and construction cases as to the entire development when the last unit is sold because this is the last occurrence of discrimination.[12]

## VI.

Finally, the Court turns to Plaintiffs' argument that they are entitled to summary judgment on liability for Defendants' failure to comply with the design and construction requirements of the FHAA as related to usable doors, placement of outlets and switches, usable kitchens and bathrooms, interior door width, and bathroom grab bar reinforcement. The design and construction requirements of the FHAA include making public use and common use areas "readily accessible and usable by handicapped persons," making doorways wide enough to accommodate wheelchairs, as well as enumerated "features of adaptive design" including an accessible route into and through the dwelling, switches and other controls in accessible locations, reinforcement in bathroom walls to allow later installation of grab bars, and usable kitchens and bathrooms so that a wheelchair can maneuver about the space. *See* 42 U.S.C. § 3604(f)(3)(C)(i)(ii)(iii). The FHAA does not specifically set out exact standards builders and designers must follow to be

---

11. Therefore, it is not that the continuing violation doctrine does not apply at all in design and construction cases as Defendants argue, or that the statute of limitations never begins it run so long as the offending buildings remain non-compliant as Plaintiffs argue.

12. When the statute would begin to run for an individual would necessarily depend on the specific allegations in the complaint. That is whether the individual were challenging a discrete act of discrimination or a practice. *See Havens*, 455 U.S. at 381, 102 S.Ct. 1114. Nevertheless, this issue is not properly before the Court at this time.

in compliance with the Act. HUD promulgated the Guidelines, in part, to give builders some guidance in how to comply with Act.

■ Plaintiffs base their argument entirely upon the fact that the units in Defendants' developments do not comply with the design and construction "requirements" contained in HUD's Guidelines. The Guidelines, however, are not mandatory. *See* 56 Fed.Reg. at 9472. "The purpose of the Guidelines is to describe minimum standards of compliance with the specific accessibility requirements of the Act." *Id* at 9476. A failure to meet the requirements as interpreted in the Guidelines does not constitute unlawful discrimination. *See id.* The Guidelines are "intended to provide a safe harbor for compliance with the accessibility requirements of the Fair Housing Amendments Act.... Builders and developers may choose to depart from the Guidelines, and seek alternate ways to demonstrate that they have met the requirements of the Fair Housing Act." *Id* at 9473. Therefore, while the Guidelines may be of some relevance, they are not decisive. The real question that must be resolved is whether the units and common areas as designed are reasonably accessible to most handicapped persons.

■ Defendants conceded during oral argument that the steps at the entrance thresholds of the units as well as steps at some entrance sidewalks render these areas inaccessible to wheelchair users. As to all other of Plaintiffs' contentions, a trial is necessary to resolve accessibility issues. The Court cannot grant summary judgment for Plaintiffs where the only uncontested evidence presented by Plaintiffs is a failure to meet the requirements set out in HUD's Guidelines.

The Court will enter an Order consistent with this Memorandum Opinion.

## ORDER

The Court has considered the parties cross motions for summary judgment on various issues. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' Partial Motion for Summary Judgment as to Liability is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is DENIED.